Filed 4/13/21  P. v. Hernandez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FIDENCIO HERNANDEZ,<br><br>    Defendant and Appellant. | B302251<br><br>(Los Angeles County<br>Super. Ct. No. LA088098) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Thomas Rubinson, Judge.  Affirmed.

Jenny M. Brandt, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

For no reason, Fidencio Hernandez kicked an unattended motorcycle parked in front of an apartment complex undergoing renovations. The motorcycle's owner confronted him in front of a liquor store 0.2 miles away, and a fight ensued. Several minutes after the fight, Hernandez returned to the apartment complex and embarked on a rampage of assault and vandalism.

After representing himself at trial, Hernandez was found guilty of a series of crimes stemming from this rampage. On appeal, he claims the trial court should have granted his *Marsden*[1] motion to replace his attorney. Because that motion was denied, he argues the court should not have taken his *Faretta*[2] waiver to represent himself and should have granted his request for advisory counsel. He also challenges the sufficiency of the evidence underlying the assault with a deadly weapon and vandalism counts. Finally, he claims the trial court should have given simple assault, self-defense, and defense of property instructions. We find no merit to his contentions. We affirm.

## BACKGROUND

### *Sequence of Events*

On March 8, 2018, Jason Gonzalez, Luis Vizcarra, and Edwin Romero were doing renovation work at an apartment complex in Los Angeles. Gonzalez had parked his undamaged motorcycle on the street. Vizcarra heard and saw Hernandez kick Gonzalez's bike, then walk away. Hernandez was carrying a backpack at the time.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

Checking his bike, Gonzalez found a "broken undertail fairing" and bent and broken clips. Some pieces were on the ground.

Gonzalez shouted at Hernandez, asking why he had kicked his bike. Hernandez responded that he "didn't give a fuck" and kept walking. He appeared drunk.

Gonzalez, Vizcarra, and Romero drove around to find Hernandez, eventually spotting him walking out of a liquor store carrying a 40-ounce beer and his backpack. The liquor store was approximately 1,000 feet, or 0.2 miles, from the apartment complex where they were working.

Gonzalez confronted Hernandez alone, and a mutual fistfight ensued. Romero broke it up. The three drove away as Hernandez called Gonzalez names and threatened him. Gonzalez thought Hernandez was intoxicated; Romero thought he "re[e]ked of alcohol." Hernandez was not charged with any crimes arising out of this initial fight.

Gonzalez, Vizcarra, and Romero returned to the apartment complex. Gonzalez left on his motorcycle, which was operable. Romero left the complex as well.

Five to eight minutes after the fight in front of the liquor store, Hernandez showed up at the apartment complex. He was carrying a tree branch, a metal painter's pole, and a two-by-four piece of wood.

Hernandez used the two-by-four to beat on the door to an apartment where Vizcarra was working, demanding Vizcarra and his friends come out.

He then used the painter's pole to shatter the rear window of a nearby truck.

He reentered the apartment complex with the tree branch. While inside, he encountered maintenance worker Arnulfo O'Campo. Although O'Campo had nothing to do with the liquor store confrontation, Hernandez accused O'Campo that his friends had hit him. Hernandez punched O'Campo in the eye, and O'Campo punched him back. Hernandez ran away, stopping to pick up a battery, a charger, and a grinder. O'Campo thought he was drunk or high.

Hernandez then chased Vizcarra out of the apartment complex and into the street. Vizcarra hid behind an ice cream cart as Hernandez beat him with the tree branch "about eight to ten times, until he hit [him] on the head and knocked [him] down." He kept hitting him while he was on the ground covering his face with his hands. Vizcarra described the blows as "very hard, very strong, trying to hit me. He wanted to hit me." The branch broke in half. According to Vizcarra, the tree branch was the size of a baseball bat: three to five feet long, and two to three inches in diameter. The branch itself was not introduced at trial, but the jury was shown a photograph of a broken branch consistent with Vizcarra's description.

Vizcarra got up and was dizzy. After this assault, Vizcarra had a swollen left hand (the hand he used to protect his head), a bump on his head, and lower back pain. He couldn't use his left hand for about two weeks.

Gabriella Garcia had been parked in front of the apartment complex with her daughter and niece and saw the events unfolding. As Hernandez attacked Vizcarra in the street, Vizcarra's supervisor used his truck to separate him from Hernandez, and Garcia drove her SUV near them. Vizcarra got in, and Garcia drove him a safe distance away.

At some point Vizcarra left Garcia's SUV and entered his supervisor's truck.  After that, one of the girls in the SUV filmed Hernandez with her cell phone.  From approximately 35 feet away, Hernandez threw the battery at Garcia's car, shattering a window and injuring one of the girl's arms with glass.

Vizcarra returned to the complex and Hernandez was gone.  He discovered his battery, charger, and grinder were missing.

### Property Damage

Photos of Gonzalez's damaged motorcycle were shown to the jury.  Gonzalez testified a full repair would have cost $700, which he couldn't afford.  He paid $250 to get it repaired as best as he could.  Photos of the repairs were also shown to the jury.  A bolt remained missing and the lines did not match as nicely as the undamaged side.

Marcelino Vargas-Flores owned the truck Hernandez damaged with the painter's pole.  He testified two windows were shattered and the frames were damaged.  The estimated cost for full repairs was $9,000.  At the time of trial, he had paid $1,200 to fix the windows, but had not made full repairs.

Garcia testified she paid $770 to repair the window Hernandez broke with the battery and fix a dent made in the frame.  The jury was shown photographs of the damage.

### Defense

At trial, Hernandez gave a somewhat alternate version of events.  On the day of the incident, he had a beer with his boss.  Afterward, he headed to a marijuana dispensary.  As he passed the apartment complex, he saw five people working and someone whistled at him, telling him to come over.  He kept walking.

He went to the liquor store and bought a beer, then went toward the dispensary.  He placed his backpack on the ground as

5

a blue car approached.  Gonzales got out and accused him of damaging his motorcycle, demanding he pay for it.  Hernandez denied knowing anything about a motorcycle.

Angry, Gonzalez punched him in the face.  The fight ensued.  Vizcarra and Romero joined Gonzalez in assaulting Hernandez.  They left.

Bloodied and disoriented, Hernandez could not find his backpack.  He told someone nearby to call the police.  He became angry and started walking down the street.  He spotted Gonzalez, Vizcarra, and Romero, and screamed at them about his backpack.  They didn't have it.  Gonzalez and Romero got into a car and drove away, while Hernandez and Vizcarra had a verbal confrontation in the street until a blue truck came between them.  He denied assaulting Vizcarra.

Hernandez was still angry and walked away, making a "conscious decision" to go back to the apartment complex.  He tried to enter through front and side doors, and O'Campo opened a door for him.  Hernandez asked him where his "friends" were and said they just assaulted him and took his backpack.  Hernandez bumped into O'Campo but didn't hit him in the face.

Hernandez made another "conscious decision" to vandalize the truck, breaking the windows with a "piece of wood."  He reentered the building because his "concern was [his] backpack."  Vizcarra punched him in the face, and O'Campo threw tools at him.  Hernandez picked up those tools and walked away.

Hernandez spotted Garcia in her SUV.  He asked why they were following him.  Someone put a hand out the SUV's window, so Hernandez threw a battery at the SUV.  He didn't "know if it was their phone, [he] couldn't really see.  [He] got paranoid, so

[he] threw the battery at the car, trying to, you know, not— basically [he] felt like [his] life was in danger."

Hernandez passed out between two buildings. He woke up with vomit on him. He made a third decision to return to the apartment complex to look for his backpack. He was arrested. An officer returned his backpack, which was retrieved from a worker at the apartment complex.

An emergency room physician assistant who treated Hernandez testified he had bruises and a swollen eye. She smelled alcohol on his breath.

A doctor testified as an expert. He reviewed photographs of Vizcarra's injuries from Hernandez's attack with the tree branch. He saw no injuries to Vizcarra's face and could not offer any opinion on whether he suffered head injuries. The doctor noted swelling on Vizcarra's hand.

*Charges and Conviction*

Hernandez was charged with six counts: assault with a deadly weapon on Vizcarra (Pen. Code, § 245, subd. (a)(1))[3]; three counts of vandalism over $400 for the damage to the motorcycle, the truck, and Garcia's car (§ 594, subd. (a)); misdemeanor battery on O'Campo (§§ 242/243, subd. (a)); and misdemeanor petty theft of the tools (§§ 484, subd. (a), 490.2). He was also charged with a prior serious felony and strike conviction.

The jury found him guilty of all counts. He was sentenced to a second-strike term of 13 years.

---

[3] All further undesignated statutory references are to the Penal Code.

7

**DISCUSSION**

## I.    Representation Issues

As noted, Hernandez represented himself at trial.  We have reviewed the record, and he did well for a non-attorney, despite the verdict against him.  Nonetheless, he now raises several issues related to his representation that he claims violated his Sixth and Fourteenth Amendment rights to counsel.  We find none meritorious.

### A.    Background

Hernandez was arrested on April 10, 2018.  The public defender's office was appointed on April 11, 2018, and defense counsel first appeared for Hernandez on April 23, 2018.  The preliminary hearing was held on May 16, 2018.  He was arraigned on May 30, 2018.

Less than a month after his arraignment, on June 21, 2018, he filled out a *Faretta* waiver form to represent himself.  It wasn't clear to the court whether he wanted to obtain new counsel or represent himself, so he clarified he wanted new counsel, but if that "doesn't work," he wanted to "go pro per."  The court held a *Marsden* hearing outside the presence of the prosecutor.

Hernandez felt his counsel had not properly represented him because she hadn't filed "certain motions . . . like *Romero*[4], subpoenas, stuff like that.  She hasn't been complying with stuff like that.  All the time she tells me she's busy with other cases, that she can't talk to me at this time.  This is the fifth—fourth time that I've come to court.  She hasn't really listened to me or tried to understand my case."  He elaborated that his counsel hadn't filed "*Romero*s, subpoenas, dismissals, you know, stuff like

---

[4]    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

8

that, discoveries and stuff. And she's not talking to me. She's not talking to me at all. She's just, 'Wait to go in court. Wait to go in court.' That's all she tells me. She's not helping me at all. She's not listening to me, anything."

The court asked if she had done anything he felt she shouldn't have done. He said, "Well, she could have done a lot more investigating for the case, and just—there's been certain conversations when I would ask her questions like certain remarks she made that she just doesn't care. That's how I feel, like she just doesn't care about my case." When pressed, he explained, "She's not listening to what I'm saying. I'm trying to speak to her, and what does she give me? Two or three minutes. And then she leaves. You know, we have no communication whatsoever."

Hernandez's public defender explained she spoke with him the day before. She said it was "kind of early in the case," and she "took some notes about my conversation with him because once he stopped talking to me I had a sense he was going to ask for a *Marsden* hearing." She "advise[d] the court that yesterday I read to Mr. Hernandez the investigation report that I received from the investigator in my office that was assigned to the case.

"Mr. Hernandez is very insistent that a surveillance video be obtained from a location, not the location where most of these charges arose, but a location about two blocks away, where Mr. Hernandez says he was—there was a fight that occurred there, and that was testified to at the preliminary hearing.

"However, Mr. Hernandez's contention is that they started it, and he is very certain that videotape would show that. So my investigator went to that—it's a strip mall, canvassed for video and didn't find any. So I told that to Mr. Hernandez yesterday.

9

"He asked me whether the investigator interviewed any of these people as witnesses, and I said, 'No, I didn't ask the investigator to do that.' And then I told him what the offer is, and I said, 'I think the offer is too high.' He said, 'The offer is too high.' Then he asked me if I would file a *Romero* motion. I said, 'Possibly.' And that was the end of the conversation.

"At that point—oh, I think I said that I thought perhaps I should have him evaluated for either substance use issues or maybe psych issues, and at that point Mr. Hernandez told me he knew the direction he wanted to take the case in and stopped talking to me."

The court asked her to respond to the allegations that she was too busy, didn't understand the case, or didn't care about it. She said, "I can't respond. I don't know where—that's how he feels. I can't be held accountable for how he feels. But I don't feel I've done anything to indicate that."

Hernandez reiterated: "I don't feel comfortable with her representing me. Like she said, it's a lot of time that they're trying to give me, and the reason why is because I know what happened that day. I remember what happened that day. I tried to explain it [to] her to the fullest extent from the first time I met her.

"I've been asking her about—she said the video. Obviously she asked for the video 90 days after we've met. They only videotape 30 days. After 30 days, 60 days, they erase everything. To me, she didn't care from the beginning. She could have done something about it, you know? She just barely wants to file—to go look for the video. That video was going to be one of the reasons why I was going to feel a lot more comfortable in this case."

The court pointed out Hernandez didn't know whether any video ever existed, so his position was based on speculation. It also pointed out the defense investigator looked for security video and didn't find any.

On the point that counsel was too busy, the court explained, "[Y]ou have to understand, sir, when you're getting a free attorney, public defender or alternate public defender, you're not going to be their only client. They're going to have a lot of other cases. That's just the reality of it, the way it works. You're getting this for free. You're getting a very good attorney for free. You can't expect her to work only on your case."

Hernandez responded, "It's just a personal choice. I just don't feel comfortable with her representing me, sir."

The court asked whether counsel was "planning on filing appropriate motions at what you believe would be the appropriate point—*Romero* motions, 995, anything like that—if you feel as an attorney they're appropriate?" It also asked if she would "obtain[] all the discovery to which you're entitled?" Counsel responded to both questions, "Yes, of course."

The court denied the motion: "Okay. Mr. Hernandez, simply not being comfortable with your attorney is not sufficient for me to grant a *Marsden* motion. You must show that a failure to replace her would substantially impair your constitutional right to assistance of counsel. In order to do that you must show that she's not providing adequate representation or that you and she have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.

"I'm not prepared to find that. Not even close. There are certain aspects of a case that the defendant has control over and certain aspects that the attorney has control over, but motions to

11

file is up to the attorney based upon her legal judgment about the case, and the timing of when to file them is also her decision, not yours.

"She's a very experienced attorney. She's a very good attorney. I've seen her handle many, many cases. She sent out an investigator at your request. The investigator was not able to find what you wanted. That's not her fault. She's not foreclosing filing motions, continuing the investigation. She's going to try to get a better offer for you. She's doing all of the things that she should be doing. [¶] So I'm going to deny your *Marsden*."

Hernandez told the court his "best choice" was to represent himself.

Back in the presence of the prosecutor, the court took Hernandez's *Faretta* waiver. As we will outline, the court frankly bent over backward to warn Hernandez against representing himself and to ensure he understood the consequences of his choice.

The court probed his educational and legal background. He had never represented himself before, but he had filed appeals and was "kind of familiar with case laws a little bit, stuff like that." He had passed the 11th grade and started working until he ended up in prison. He said he understood the charges against him, but couldn't identify the elements of the crimes. He also underestimated the maximum sentence he was facing. The court explained he was "looking at a lot of time."

The court warned him, "Representing yourself is almost always a bad decision. You're going to be totally overmatched here. You don't have legal training. You don't have the experience of the prosecutor that you're going to be opposing." The prosecutor said he'd been a district attorney for 11 years and

tried 100 cases.  The court reiterated, "This is not going to be a fair fight, Mr. Hernandez.  He's a pro.  You don't even know what the first element of the first charge is.  You don't know how much time you're facing.  You don't have any idea what you're doing.  He's been doing this for 11 years and done 100 trials."

Hernandez said he understood.

The court pressed on.  It used a soccer analogy:  "[T]his is like you trying to go against a professional in a sport.  You could go out there and kick the ball around with him, and you'd probably kick it just fine.  But try to get competitive?  Try to win or lose?  You think you have a chance against that guy?  No chance, right?

"He's a professional in his world, which is the courtroom.  You're not.  Okay?  You can mess around in here and file a motion or make an argument or something, but a whole jury trial against a professional?  You think that's going to be a fair fight?  No chance.  He knows exactly what he's doing.  You have no idea what you're doing."  The court added that it was going to be more difficult for Hernandez to prepare for the case than for the prosecutor because he would have limited access to the phone and library.  The court said it wasn't fair, but "that's the way it is, though."

Hernandez again said he understood.  He repeated, "It's just a personal choice."

The court pressed further.  It told him he wasn't getting special help from the court.  He would be expected to know how to do everything himself.  He would have to "investigate the case, make motions, subpoena witnesses, present evidence, select a jury, examine witnesses, argue the case.  You're going to be

expected to do all of those things.  You are going to be the attorney without any help.”

The court told him he didn't have a right to co-counsel, but it would appoint standby counsel.  It warned that standby counsel could be put at a disadvantage if they had to take over mid-trial.

The court said a request to continue the trial when it's ready to start would likely be denied if the request is intended to delay for no reason.  The court said it would remove him for any disruptive conduct in the courtroom.  The court wanted him to “understand that there are risks and dangers in any criminal trial that cannot be anticipated and that only a lawyer can identify, and many times those risks mean the difference between acquittal and conviction.  And, like I told you, if you get convicted in this case you're looking at a lot of time.”

Hernandez continually said he understood all of this. But he still didn't want his current counsel because she wasn't helping him and he didn't feel comfortable with her.

The court still pressed him, “You think you have a better chance with her or without her?”  He said, “I know I need her. I know I do.”  But he didn't “feel comfortable with her representing” him.  He said that's why he made the *Marsden* motion—he would “rather have somebody else represent” him. The court told him there was “not enough legally” to grant the *Marsden* motion so his choice was either “her or you yourself.” He opted to represent himself.

The following exchange followed:

“The Court:  You're making a giant mistake.  You know how many lives you have?  One.

14

"The Defendant:  I know.  How do you think I feel?  My mom's about to die of cancer.

"The Court:  What are you doing?  You're firing a really good lawyer.

"The Defendant:  She's not doing nothing for me.

"The Court:  You think you're going to do better?

"The Defendant:  She hasn't taken not one minute to understand my side of the case.  All she's been talking about is their side of the case, their side of the case.  My side of the case doesn't matter to her."

The court concluded:  "You want to do this?  You can do this, Mr. Hernandez.  You're making a gigantic mistake.  With your one life, you're giving it away.  That's your choice.  It's your constitutional right to do it.  You can do it."  Hernandez said, "It's all right."

The court found his waiver "knowing, intelligent, unequivocal and unconditional.  He is doing this with his eyes wide open.  I don't know why he's doing it, but he has the right to do it.  [¶]  The court is also finding that Mr. Hernandez has the cognitive and communicative skills necessary to represent himself.  He has a rational and factual understanding of the proceedings against him.  He can understand and use the relevant information rationally to respond to the charges, and he can coherently communicate that response to the trier of fact."

Representation issues continued to pop up during pretrial and trial proceedings.  At the next hearing after Hernandez's *Faretta* request was granted, he changed his mind and requested a "state-appointed" attorney.  The court explained it would reappoint the public defender's office and, although it could possibly assign a new deputy public defender, he would most

15

likely get the same deputy public defender he had before his *Marsden* motion. Hernandez repeated some of his complaints already considered during his *Marsden* hearing. When the court told him there was a "probability" his former deputy public defender would be reappointed, he decided to keep his pro per status.

At another pretrial hearing, the court denied Hernandez's section 995 motion and declined to consider Hernandez's version of events because he had not testified at the preliminary hearing. Hernandez complained that he was willing to testify at the preliminary hearing, but his deputy public defender didn't allow him to.

A week later Hernandez filed a written motion for advisory counsel. He requested advisory counsel to (1) assist in presenting visual aids and exhibits through the court's audio/visual equipment; (2) give guidance on local customs, practice rules, the court's individual practices for voir dire and other parts of trial; and (3) help prepare expert witnesses. The court denied the motion, explaining: "[Y]ou've chosen to be your own attorney, so if you're going to continue as a pro per, then you're going to be the attorney. You're not going to have somebody sitting there with you. I told you that was the case before I granted your pro per. You chose to go forward anyway. So that's the way it's going to be." Hernandez said, "I felt like advisory counsel would help me out in my case whenever I'm litigating my case." The court responded, "I'm not going to provide that. That's something which is discretionary with the court, and I'm not inclined to do that. Either you want to be your lawyer or you don't." It offered to appoint standby counsel.

The issue came up again, and the court elaborated: "[I]t's a discretionary matter for the court whether to appoint advisory counsel, and I'm choosing not to do it. I'm respecting your right to represent yourself, which is what you've chosen to do, but you're not going to have your cake and eat it, too. Either you're going to represent yourself or you're not." Hernandez felt the court was "violating . . . [his] personal rights" and was "real prejudiced and real biased" against him. The court assured him it had "nothing against [him] at all," but his motions were not based on law. The court said, "The problem is you don't have a lawyer, so you think you know what you're doing, and you don't." The court again offered to appoint standby counsel, but Hernandez said he wanted advisory counsel. The court again denied the request.

Nearly three months later, Hernandez filed a renewed motion for advisory counsel, asserting similar reasons to the ones he previously raised. The court again offered to appoint standby counsel and again denied the motion: "[Y]ou're the attorney here. So I am not going to have somebody sitting here with you potentially, which is filling your ear telling you what to do. You've chosen to be pro per. That's fine. It's your right. I'll appoint somebody to stand by in case you give up your pro per they'll be ready to step in. But, you know, not—I'm not obligated to appoint an advisory counsel for you. I did consult about this with supervising judges here. And, you know, if you want—like I said, if you want standby I will appoint standby counsel for you. That's as far as I can go on that." Hernandez argued advisory counsel could "guarantee [him] a proper trial." The court responded, "[Y]ou really want the best of both worlds. You want to represent yourself, but you also want an attorney here to

17

essentially help you. That's not the way it works." Hernandez argued advisory counsel and standby counsel were the same, but the court pointed out they were not. Hernandez declined standby counsel.

Hernandez requested advisory counsel one more time before trial. The court reiterated it had discretion to appoint advisory counsel, but again denied the request. It reminded Hernandez that he had chosen to represent himself, and at the time he understood he would be his own attorney. The court once more offered to appoint standby counsel, and Hernandez once more declined.

Just prior to trial, the prosecutor told the court Hernandez needed standby counsel because she did not "believe he can do this trial without a standby counsel, at least, appointed." She made the request to preserve any issues on appeal. The court pointed out Hernandez had already declined appointment of standby counsel.

Hernandez represented himself throughout trial without either advisory or standby counsel.

### B. The *Marsden* Request Was Properly Denied

A defendant may have appointed counsel replaced if counsel is not providing adequate representation or if " 'counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Dickey* (2005) 35 Cal.4th 884, 917.) Disagreements over counsel's tactical decisions do not justify appointing new counsel. (*Id.* at p. 922.)

A *Marsden* hearing " ' "is not a full-blown adversary proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in

18

counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement." [Citation.]' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 803 (*Gutierrez*).)  The court must give the defendant "the opportunity to explain the reasons for desiring a new attorney."  (*People v. Smith* (1993) 6 Cal.4th 684, 690 (*Smith*).)  After that, substitution is a matter of judicial discretion.  (*Ibid.*)  "The decision to substitute counsel is within the discretion of the trial court; this court will not find an abuse of discretion unless the trial court's failure to substitute counsel would ' " 'substantially impair' the defendant's right to effective assistance of counsel." ' " (*Gutierrez, supra,* at p. 803.)

Hernandez concedes the court afforded him an opportunity to be heard and "made *some* inquiry of defense counsel."  (Italics in original.)  He nonetheless claims the court's inquiry was inadequate.  As our detailed recitation of the record should demonstrate, he is wrong—the court's inquiry was more than sufficient to deny his request.

Hernandez's trial counsel had represented him for only two months when Hernandez requested to replace her.  The court immediately held the ex parte hearing.  It listened to Hernandez's complaints and counsel's responses.  It received assurances from counsel she would file appropriate motions at the appropriate times and would obtain discovery.  While Hernandez complained his counsel was not spending any time with him or listening to him, when pressed, he conceded he simply did not "feel comfortable" with his counsel and his request was a "personal choice."  The issue was a "credibility question between defendant and counsel," and "the court was 'entitled to accept counsel's explanation.' " (*Smith, supra,* 6 Cal.4th at p.

19

696; see *People v. Clark* (2011) 52 Cal.4th 856, 918 ["After permitting defendant to fully air his complaints with counsel, inquiring into those complaints, and evaluating them against counsel's explanations and the court's own observations of defendant's in-court communication with his attorneys, the court reasonably could find defendant's claimed inability to communicate was volitional and contrived. A defendant 'cannot simply refuse to cooperate with his appointed attorney and thereby compel the court to remove that attorney.' "].)

Hernandez argues the court should have asked more questions of counsel about her investigation, witness interviews, and the alleged breakdown in her relationship with him. The cases he cites are all distinguishable. This is not a case in which the trial court failed to ask *any* questions of counsel. (See *People v. Munoz* (1974) 41 Cal.App.3d 62, 66; *People v. Groce* (1971) 18 Cal.App.3d 292, 295.) This is also not a case in which the court failed to ask about the anticipated testimony from the witnesses the defendant *specifically* identified. (See *People v. Stewart* (1985) 171 Cal.App.3d 388, 398, disapproved on another ground in *Smith, supra,* 6 Cal.4th at p. 696.)

The court asked counsel to explain her side, and she did. She correctly noted it was "kind of early in the case," implying investigation would be ongoing. Hernandez was demanding a surveillance video from the liquor store area, even though none of the charges were based on the fight at that location. Nevertheless, she sent the defense investigator to look for any video, and the investigator found none. True, counsel said she had not asked the investigator to interview witnesses, but she

20

never said she *wouldn't*.[5]  Again, it was early in the case, and the trial court was certainly entitled to assume at that point interviews would be conducted when counsel thought they were tactically necessary.  The court was familiar with this particular deputy public defender, and it was entitled to credit her assurances that she would follow through on these basic aspects of representation.  (Cf. *People v. Crandell* (1988) 46 Cal.3d 833, 860 (*Crandell*), overruled on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365 ["Given the early stage of the proceeding at which defendant rejected [his appointed counsel's] assistance, the trial court could reasonably conclude that defendant had not made sufficient efforts to resolve his differences with [counsel] or given [counsel] sufficient time to demonstrate he was worthy of defendant's trust."].)

Hernandez faults the trial court for not asking more questions when he argued, "she asked for the video 90 days after we've met.  They only videotape 30 days.  After 30 days, 60 days, they erase everything."  The court rightly viewed this as nothing more than speculation.  Even if Hernandez's hypothesized timeline were accurate, he wasn't arrested, and counsel wasn't appointed, until more than 30 days after the incident.  The preliminary hearing wasn't held until more than 60 days after the incident.  Given the early stage of proceedings and the relative insignificance of the video from the liquor store to the actual charges, the court did not need to inquire more thoroughly into Hernandez's speculative claim.

---

[5]     On appeal, Hernandez identifies seven civilian witnesses. All of them testified at trial and were subject to cross-examination.

Hernandez claims the trial court also failed to inquire whether the attorney/client relationship was irreconcilably damaged because his counsel told him she was "busy" and wouldn't talk to him. He relies on *People v. Hill* (1983) 148 Cal.App.3d 744, but the court in that case found error because the trial court had held conversations with defense counsel off the record and outside the defendant's presence. (*Id.* at p. 755.) No such ex parte off-the-record conversations occurred here. The court specifically asked counsel to respond to Hernandez's allegations. She said she "can't respond" and couldn't "be held accountable for how he feels," but she didn't "feel [she had] done anything to indicate that." This suggests counsel had no conflict with Hernandez. If a conflict existed, it was created by Hernandez's own desire to control the tactical decisions that fell within counsel's purview. That was not enough to appoint new counsel. (See *Smith, supra,* 6 Cal.4th at p. 696 ["[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict."].) It is not clear what further clarification the trial court needed to reach that conclusion.

Hernandez argues that, even if the trial court's *Marsden* inquiry was adequate, the court abused its discretion in denying his request. He revisits the issues surrounding the hypothetical surveillance video, arguing his counsel's "busy" caseload interfered with her ability to timely get the video. This is more speculation. She had the defense investigator working, including searching for any video. She was also evaluating a possible plea deal. Again, his counsel was only two months into representing him. The court acted within its discretion in concluding the failure to substitute counsel would not " ' " 'substantially impair'

22

the defendant's right to effective assistance of counsel." ' "
(*Gutierrez, supra,* 45 Cal.4th at p. 803.)

### C. The *Faretta* Request Was Properly Granted

The Sixth Amendment grants a defendant the right to knowingly and intelligently waive the right to counsel. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1363–1364.) The request must be timely and unequivocal. (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) On appeal, we "independently examine[] the entire record to determine whether the defendant knowingly and intelligently invoked his right to self-representation." (*Ibid.*)[6]

Hernandez argues his *Faretta* waiver was equivocal because he was put to the choice of either keeping his current counsel after the court denied his *Marsden* request or representing himself. This kind of choice does not undermine a *Faretta* waiver. "Defendant confuses an 'equivocal' request with a 'conditional' request. There is nothing equivocal in a request that counsel be removed and, if not removed, that the defendant wants to represent himself. Once the court has decided not to remove counsel, the defendant has the choice of going ahead with existing counsel or representing himself. There is nothing improper about putting the defendant to this choice, so long as the court did not err in refusing to remove counsel." (*People v. Michaels* (2002) 28 Cal.4th 486, 524 (*Michaels*); see *People v. Weeks* (2008) 165 Cal.App.4th 882, 887 [error to revoke pro per status when defendant made clear he would rather represent himself than have public defender reappointed].)

---

[6] Respondent contends Hernandez invited any error because his request was granted. We need not decide whether any error was invited because Hernandez's claim fails on the merits.

None of the cases Hernandez cites rebuts this rule. In *People v. Marshall* (1997) 15 Cal.4th 1 (*Marshall*), the high court affirmed the denial of a *Faretta* motion because the defendant made the request when he was upset about having to give blood and tissue samples. The request was thus "ambivalent in the context of that hearing and also was made to delay and disrupt the proceedings." (*Marshall, supra,* at p. 25.) Hernandez's request was neither ambivalent nor made to disrupt the proceedings. He opted to represent himself because he didn't like his current counsel. The court's thorough advisements guaranteed he understood his rights and the dangers of self-representation. He chose to represent himself anyway. It doesn't matter, as he argues, that he repeatedly said he would do better with an attorney. Of course he would have. He *had* an attorney; he just didn't like her. He wanted an attorney *of his choice*. Indeed, he later refused to relinquish his pro per status because the court would not guarantee a new attorney from the public defender's office. As *Michaels* held, once his *Marsden* motion was properly denied, he could unequivocally opt to represent himself in lieu of having his current counsel continue to represent him.

Hernandez also analogizes to *People v. Carlisle* (2001) 86 Cal.App.4th 1382 (*Carlisle*), but the case suggests the trial court would have committed reversible error if it had *not* granted his *Faretta* request. The facts are similar: the defendant did not want his appointed deputy public defender, and when the court denied his *Marsden* motion to substitute counsel, he repeatedly requested over the course of four months to represent himself. The trial court denied every request, treating them as equivocal because he made them in response to the court's refusal to appoint a different attorney. (*Carlisle, supra,* at pp. 1386–1389.)

24

The Court of Appeal held the failure to grant the *Faretta* request in this circumstance was reversible error. It rejected the attorney general's reliance on a line of federal law summarized in *Marshall* that " 'a motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation.' " (*Carlisle, supra,* 86 Cal.App.4th at p. 1389.) While the trial court's denial of the defendant's initial *Faretta* request after the denial of his *Marsden* motion was in line with this authority, at some point over four months his repeated requests should have been granted. "We cannot equate defendant's four-month long repeated requests to proceed in pro se to be a litigation decision resulting from 'temporary whim, or out of annoyance or frustration. . . .' " (*Carlisle, supra,* 86 Cal.App.4th at p. 1390.)

Here, of course, the court granted Hernandez's initial request to represent himself, so our record does not reflect months of requests. What the record does reflect is that Hernandez's complaints continued, and he opted to represent himself rather than face the "probability" that his former deputy public defender would be reappointed. The record makes clear that his request—and his reaffirmance of that choice—was made upon reflection and not on a " 'temporary whim, or out of annoyance or frustration . . . .' " (*Carlisle, supra,* 86 Cal.App.4th at p. 1390.)

Lastly, Hernandez cites *People v. Cruz* (1978) 83 Cal.App.3d 308 (*Cruz*), which held the trial court did not adequately inquire into the defendant's *Marsden* request, so his request to represent himself was invalid. (*Cruz, supra,* at p. 318.) Because we have upheld the denial of Hernandez's *Marsden*

motion, the trial court did not err in denying Hernandez's *Faretta* request.

**D.     The Request for Advisory Counsel Was Properly Denied**

A trial court has discretion to appoint advisory counsel to a self-represented defendant.  (*People v. Choi* (2021) 59 Cal.App.5th 753, 766.)  "Factors for the court to consider include the defendant's education, familiarity with the criminal justice system, and demonstrated legal abilities; the defendant's reasons for seeking advisory counsel, including evidence of a manipulative purpose; the seriousness of the charges; and the complexity of the issues.  [Citation.]  We review the decision for abuse of discretion and will only set it aside if it is 'arbitrary, capricious, or whimsical.' " (*Ibid.*)

Hernandez contends the trial court abused its discretion because it failed to consider any of the relevant factors in denying advisory counsel.  His characterization of the record is incorrect, and even if not, we find no reversible error.

This is not a case in which the court failed to recognize its discretion; the court repeatedly noted that it had discretion to grant or deny Hernandez's requests for advisory counsel.  (Cf. *Crandell, supra,* 46 Cal.3d at p. 862; *People v. Bigelow* (1984) 37 Cal.3d 731, 743.)  The court repeatedly denied his requests because it believed Hernandez was attempting to "have your cake and eat it, too.  Either you're going to represent yourself or you're not."  As the court explained, "[Y]ou really want the best of both worlds.  You want to represent yourself, but you also want an attorney here to essentially help you.  That's not the way it works."

The court's comments can be reasonably interpreted to reflect a belief that Hernandez was attempting to manipulate the court. His requests came after the court denied his *Marsden* motion, during which he made clear he wanted different counsel. Opting to represent himself and then requesting advisory counsel could have been a ploy to get the result he was previously denied: a new attorney. "Where a defendant represented by the public defender has undertaken self-representation only after seeking appointment of private counsel and after having failed to demonstrate proper grounds for appointment of substitute counsel, a request to have private counsel appointed in an advisory capacity might evidence a manipulative endeavor to obtain the appointment of private counsel without showing of conflict or inadequacy sufficient to remove the public defender in the first instance. Where the record supports an inference of such a manipulative purpose, a court might be justified in denying a request for advisory counsel." (*Crandell, supra,* 46 Cal.3d at p. 863.)

In any event, the court's failure to express additional reasons to deny advisory counsel was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. *Crandell* controls. In that case, the defendant's requests for advisory counsel were summarily denied because the trial court believed " 'there is no such thing' " and it " 'wouldn't appoint that kind of counsel anyway.' " No judge had recognized the discretion to grant the request or had engaged in a reasoned exercise of judgment based on the circumstances of the case. Our high court held this "failure to exercise discretion was error." (*Crandell, supra,* 46 Cal.3d at 862.)

*Crandell* nonetheless concluded this kind of error is amenable to harmless error analysis when "a refusal to grant the request would not have been an abuse of discretion." (*Crandell, supra,* 46 Cal.3d at p. 864.) Examining the defendant's background and skill before and during trial, the court held the trial court would not have abused its discretion in denying advisory counsel, so any error in failing to exercise that discretion in the first instance did not result in prejudice. (*Id.* at pp. 863–866.)

The same analysis applies here. Hernandez appeared intelligent and was articulate. He had an 11th grade education and some experience with the criminal justice system. While he underestimated the amount of prison time he was facing, the court clarified it and he was unfazed. He filed numerous motions containing case citations and reasoned analysis, including a new trial motion raising issues similar to those raised by his appellate counsel here. He worked with an investigator to assist in investigating and subpoenaing witnesses, obtaining discovery, and searching for video from the incident. He hired an expert witness.

This was not a complex case. The charges and the facts surrounding the incident were straightforward. During trial, Hernandez effectively cross-examined witnesses and testified on his own behalf, denying the events occurred in the way other witnesses had described. He called the physician assistant who treated him for injuries to bolster his testimony that he was attacked. He called a medical expert to bolster his defense that Vizcarra had not suffered serious injuries from the tree branch.

We have reviewed the record. Hernandez performed well as a non-attorney. He certainly could have done better. Perhaps

28

he made the missteps he points out in his briefs on appeal. But that makes him no different from most non-attorney defendants who represent themselves. Had the trial court expressly cited these case-specific factors to deny advisory counsel, it would not have abused its discretion. Its failure to do so did not prejudice Hernandez.

## II. Sufficiency of the Evidence Challenges

Hernandez argues insufficient evidence supported his convictions for assault with a deadly weapon and the three counts of vandalism. We evaluate these claims by reviewing the entire record to determine whether there is " 'substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) We do not resolve credibility issues or conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid.*) We find sufficient evidence supported these counts.

### A. Assault with a Deadly Weapon

For attacking Vizcarra with the tree branch, Hernandez was convicted of committing "assault . . . with a deadly weapon or instrument other than a firearm" in violation of section 245, subdivision (a). Hernandez contends the evidence was insufficient to demonstrate the tree branch qualified as a deadly weapon. We disagree.

" 'As used in section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce

29

death or great bodily injury." ' " (*In re B.M.* (2018) 6 Cal.5th 528, 532–533 (*B.M.*).) The prosecution here did not argue the tree branch was an inherently deadly weapon, so " '[i]n determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' " (*Id.* at p. 533.)

B.M. sets out several considerations to guide this analysis. "First, the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "*likely to produce* death or great bodily injury." ' " (*B.M., supra,* 6 Cal.5th at p. 533.) Second, we may not engage in "conjecture as to how the object could have been used. Rather, the determination of whether an object is a deadly weapon under section 254(a)(1) must rest on evidence of how the defendant actually 'used' the object." (*B.M., supra,* at p. 534.) Finally, "although it is appropriate to consider the injury that could have resulted from the way the object was used, the extent of actual injury or lack of injury is also relevant. '[A] conviction for assault with a deadly weapon does not require proof of an injury or even physical contact' [citation], but limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Id.* at p. 535.)

Applying those principles to the facts before it, the court in *B.M.* held insufficient evidence showed the juvenile's "use of a butter knife against her sister's blanketed legs was ' "likely to produce . . . death or great bodily injury." ' " (*B.M., supra,* 6 Cal.5th at p. 536.) The knife was not sharp; the juvenile did not use the knife on the victim's "head, face, or neck, or on any

30

exposed part of her body"; and the "moderate pressure" the juvenile used did not penetrate the blanket covering the victim's legs. (*Id.* at p. 536.) There was also no evidence the victim took defensive actions, although the court took care to note "an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway. But the facts known to the aggressor before the assault, including defensive measures taken by the victim, are relevant to determining whether the aggressor used an object in a manner likely to cause serious injury." (*B.M., supra,* 6 Cal.5th at p. 537.)

Here, the jury was presented with the type of evidence *B.M.* found missing in that case. The characteristics of the tree branch leave no question it was capable of and likely to cause serious injury. It was large and thick—three to five feet long, and two to three inches in diameter—and described by Vizcarra as about the size of a baseball bat. The jury saw a photograph of a broken branch, consistent with that description. (See *People v. Morlock* (1956) 46 Cal.2d 141, 146 [fence post four feet 11 inches long, four inches by four inches square, and weighing 10 pounds was deadly weapon]; *People v. McCullin* (1971) 19 Cal.App.3d 795, 801 ["baseball bat can be a deadly weapon because of the manner in which it is used" for purpose of probation condition]; *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 835 [wooden stick 18 to 20 inch long and one inch in diameter used to strike young daughters on different parts of body was deadly weapon for weapon enhancement].)

The way Hernandez used the branch also demonstrated it was capable of and likely to inflict serious injury. He targeted Vizcarra's head and face, and he put serious force behind the

31

repeated blows.  He beat Vizcarra "about eight to ten times, until he hit [him] on the head and knocked [him] down."  Vizcarra described the blows as "very hard, very strong, trying to hit me.  He wanted to hit me."  True, Vizcarra did not suffer life-threatening injuries.  Yet, when he got up, he was dizzy.  He suffered a bump on the head and lower back pain, and he couldn't use his swollen hand for two weeks.  Hernandez makes much of the fact that the branch broke as he hit Vizcarra, suggesting he used the branch to its maximum tolerance and it did not inflict serious harm on Vizcarra.  He ignores the fact that Vizcarra used his hands to shield his head and body from the blows.  This falls squarely within *B.M.*'s caveat that Hernandez "should not receive the benefit of [Vizcarra] fortuitously taking a defensive measure" to protect his head from more serious injury.  (*B.M., supra,* 6 Cal.5th at p. 537.)

Hernandez cites *People v. Beasley* (2003) 105 Cal.App.4th 1078 (*Beasley*), but the jury in that case had none of the evidence the jury was presented with here.  In that case, the court held neither a broomstick nor a vacuum cleaner attachment qualified as a deadly weapon.  As for the broomstick, the victim was struck on her arms and shoulders, causing bruises.  She was not struck in the head or face.  She did not describe the degree of force used or the character or composition of the broomstick.  Neither the broomstick nor any photographs of it were shown to the jury.  (*Id.* at pp. 1087–1088.)  The same was true of the vacuum cleaner attachment.  The victim was struck once on the shoulder and once on the back, causing bruises.  She described the object as plastic and used to clean the ceiling in the corners.  Neither the attachment nor any photographs of it were shown to the jury.  (*Id.* at p. 1088.)

The record here contains ample evidence to support the jury's conclusion the tree branch was a deadly weapon because Hernandez " ' "used [it] in such a manner as to be capable of producing and likely to produce death or great bodily injury." ' " (*B.M., supra,* 6 Cal.5th at pp. 532–533.)

### B.     Vandalism Counts

In convicting Hernandez of three counts of felony vandalism, the jury found each act inflicted more than $400 in damage.  (§ 594, subd. (b).)  Hernandez argues the evidence was insufficient to demonstrate the value of the damages in any of the counts.  We disagree.

Section 594 does not address the proper method of valuing damage for vandalism charges.  We think actual cost of repairs is a sensible approach.  (See § 1202.4, subd. (f)(3)(A) [for purposes of restitution, value of damaged property "shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible"]; see *In re Kyle T.* (2017) 9 Cal.App.5th 707, 713 (*Kyle T.*).)

Vargas-Flores and Garcia each testified they actually paid more than $400 to repair their vehicles.  Vargas-Flores estimated the cost for full repairs to his truck was $9,000, and he paid $1,200 to fix the windows.  Garcia testified she paid $770 to repair the SUV window and fix a dent made in the frame.  The jury was shown photographs of the damage.  It makes no difference, as Hernandez contends, that the prosecution did not introduce actual invoices or bills for the victims' payments.  That goes to the weight of their testimony, not its sufficiency.  While additional documentation would have bolstered the prosecution's case, these victims testified to the costs they actually paid.  Corroborated by the photographs showing the damage to the

33

vehicles, each witness's testimony was sufficient to prove beyond a reasonable doubt that the value of damage to their vehicles exceeded $400.

Gonzalez's testimony presents a slightly closer question. He testified he actually paid only $250 to repair his motorcycle, but he testified the cost of full repairs would have been $700. Although he could not afford to pay for the full repair, his testimony was evidence of actual cost. Again, the prosecution did not need to introduce an invoice showing the $700 cost. The photos of both the damaged and partially repaired motorcycle corroborated Gonzalez's testimony that more repairs were needed, and the jury could credit his testimony as to what those additional repairs would cost. That was sufficient to find beyond a reasonable doubt that the value of the damage exceeded $400.

Although cited by Hernandez, both *Kyle T.* and *In re A.W.* (2019) 39 Cal.App.5th 941 are distinguishable because neither case involved evidence of actual costs. In *Kyle T.*, the only evidence of the cost to clean the graffiti caused by the juvenile was a one-page graffiti removal cost list that did not identify the actual costs to remove these specific acts of graffiti. (*Kyle T., supra,* 9 Cal.App.5th at p. 714.) *In re A.W.* similarly involved evidence of the average costs to remove graffiti, not the actual costs to remove the graffiti at issue. (*In re A.W., supra,* 39 Cal.App.5th at p. 949.) Here, by contrast, each owner of each damaged vehicle testified to how much they either paid or would have to pay to repair the specific damage. If Hernandez wanted to attack the persuasive value of that testimony, he had the

34

opportunity to do so at trial.[7]  Sufficient evidence supported the vandalism convictions.

## III.  Instruction on Lesser Offense of Simple Assault

Simple assault is a lesser included offense to assault with a deadly weapon.  (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.)  Hernandez claims the trial court erred and violated his state and federal constitutional rights by not instructing the jury on the lesser offense of simple assault for his attack on Vizcarra with the tree branch.  He argues the jury could have concluded the tree branch was not a deadly weapon and convicted him of simple assault.  We disagree.

A trial court must instruct on lesser included offenses only if substantial evidence would support a jury's finding that the lesser offense, but not the greater offense, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 177 (*Breverman*).) "This standard requires instructions on a lesser included offense whenever ' "a jury composed of reasonable [persons] *could . . . conclude*[]" ' that the lesser, but not the greater, offense was committed.  [Citations.]  In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Ibid.*)  A court need not instruct on a lesser offense, however, "where the evidence establishes if the

---

[7]  Hernandez suggests these victims' testimony was hearsay. He forfeited the issue by not asserting hearsay objections in the trial court.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.)

35

defendant was guilty at all, he was guilty of the higher offense." (*People v. Ellers* (1980) 108 Cal.App.3d 943, 954.)[8]

For the same reasons Hernandez argues insufficient evidence supported a finding that the tree branch was a deadly weapon, he argues the jury *could have found* the tree branch was not a deadly weapon and convicted him of simple assault. No reasonable jury could have reached that conclusion on this record.

Again, the prosecution had to prove the tree branch was " ' "used in such a manner as to be capable of producing and likely to produce death or great bodily injury." ' " (*B.M., supra,* 6 Cal.5th at pp. 532–533.) For all the reasons already explained, the prosecutor's evidence overwhelmingly satisfied that standard—the branch was the size of a baseball bat; Hernandez hit Vizcarra with it multiple times "very hard," including in the head; and Vizcarra suffered lingering injuries. The injuries were not severe, but that was almost certainly the result of Vizcarra protecting himself, not due to the manner in which Hernandez used the branch. Indeed, Hernandez hit him so hard the branch broke.

---

[8]     Respondent argues Hernandez forfeited this argument by not requesting a simple assault instruction in the trial court. Long-settled law imposes a sua sponte duty on the trial court to give instructions on lesser offenses supported by the evidence; indeed, the court must give them over the defendant's objections. (*Breverman, supra,* 19 Cal.4th at pp. 154–155.) We find no forfeiture.

There was no contrary substantial evidence that could have supported a finding of simple assault. Hernandez did not testify to some other version of the assault; he denied he committed the assault at all. So to convict Hernandez of any assault, the jury had to accept Vizcarra's description of the attack. That description left no question Hernandez used the branch in a manner that was both capable of and likely to produce great bodily injury. Hernandez again analogizes to *B.M.* and *Beasley*, but again, the evidence here did not resemble the evidence in those cases.

Hernandez also focuses on the fact that Vizcarra wasn't seriously injured, and the jury was instructed, "No one needs to actually have been injured by the defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault, and if so, what kind of assault it was." His argument loses sight of the question the jury faced, which was whether he *used the branch* in a way " ' "as to be capable of producing and likely to produce death or great bodily injury." ' " (*B.M., supra,* 6 Cal.5th at pp. 532–533.) The extent of the actual injury is relevant to illuminate the dangerousness of the object and how it was used. Hence, "limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Id.* at p. 535.)

Hernandez did not use the branch lightly, or aim for Hernandez's torso or legs, or pull back at any point. The only evidence showed an aggressive, forceful, repeated attack with a baseball-bat-sized tree branch targeting Vizcarra's head and face. Vizcarra only escaped more serious injury because he protected

37

himself with his hands.  No reasonable jury could have looked at the limited extent of Vizcarra's injuries and concluded Hernandez did not *use* the branch in a manner capable of producing and likely to produce great bodily injury.  On this record, if Hernandez was guilty at all, he was guilty of the greater offense of assault with a deadly weapon and not the lesser offense of simple assault.  No instruction on simple assault was warranted.

## IV.    Instruction on Defense of Property

Hernandez argues the court erred and violated his constitutional rights by not giving an instruction on defense of property as a defense to the assault with a deadly weapon count.  His theory is that the evidence supported a conclusion he was justified in assaulting Vizcarra to defend his missing backpack.

An instruction on an affirmative defense is only warranted when substantial evidence supports it and it is not inconsistent with the defendant's theory of the case.  (*Breverman, supra,* 19 Cal.4th at p. 157.)  Here, the evidence came nowhere close to justifying this instruction, and the instruction conflicted with Hernandez's testimony that he did not assault Vizcarra.[9]

A necessary element of defense of property is *imminent* harm.  (CALCRIM No. 3467.)  Evidence of that element was entirely missing.  Hernandez testified he angrily returned to the apartment complex because he could not find his backpack.  At no time during his rampage did he know what happened to it.  There

---

[9]    Hernandez suggests in his reply brief that he was entitled to this instruction because he was relying on defense of property as a defense.  Even so, the trial court was only obligated to give the instruction if it was supported by substantial evidence. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823.)

was no evidence Vizcarra ever had the backpack, and yet according to Vizcarra, Hernandez chased him into the street and viciously beat him with a tree branch. According to Hernandez, he did not assault Vizcarra at all, which is inconsistent with the theory that he was compelled to assault Vizcarra to defend his backpack. In either version, nothing indicated Vizcarra posed any danger to Hernandez's missing backpack, let alone danger that was so imminent that Hernandez had to take defensive measures. There was no evidence to justify Hernandez chasing him down and repeatedly beating him in order to protect his backpack. The court did not err by not giving a defense of property instruction.

## V.    Self-Defense Instruction

Hernandez argues the trial court erred and violated his constitutional rights by refusing to give a self-defense instruction for the vandalism count based on him throwing the battery at Garcia's SUV. We will assume for the sake of our opinion that self-defense is a defense to vandalism. Again, the instruction was only warranted if it was supported by substantial evidence. (*Breverman, supra,* 19 Cal.4th at p. 157.) Insufficient evidence supported giving it here.[10]

For self-defense to apply, "the defendant must actually and reasonably believe in the need to defend." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) Perfect self-defense requires the defendant's belief to be objectively reasonable, that is, "[t]he

---

[10]    Respondent argues at length that a self-defense instruction was not warranted for the assault with a deadly weapon count. Hernandez does not assert that argument on appeal. We will not address it.

39

circumstances must be sufficient to excite the fears of a reasonable person . . . .' " (*Ibid.*)  In assessing objective reasonableness, "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' [Citation.]  It judges the reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.]  To do this, it must consider all the ' " 'facts and circumstances . . . in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety.' " ' " (*Id.* at pp. 1082–1083.)

Further, "the fear must be of imminent harm.  'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.' " (*People v. Humphrey, supra,* 13 Cal.4th at p. 1082.)

Hernandez argues a self-defense instruction was warranted based on his trial testimony about his reaction to Garcia and her SUV.  He testified, "Later on, later on I see somebody put their hand out the window.  I don't know if it was their phone, I couldn't really see.  I got paranoid, so I threw the battery at the car, trying to, you know, not—basically I felt like my life was in danger.  There was a lot of them.  There was like five, six of them.  There was only one of me.  So I mean, you know, I got paranoid.  I did throw the battery at the car and I continued my route—I continued—well, I continued to leave."

On cross-examination, he testified he saw the SUV following him and asked, "Why are you following me?" He explained: "As I kept walking, I see that the vehicle still following me, so I turn around and I see something—somebody or something just kind of stick out their hand or something." He added, "I just see somebody put their hand out or put something up in the air. That got me paranoid."

He later described throwing the battery as a "natural reaction for being threatened" and a "simple reaction." He admitted, "[I]t's bad that I threw something like that, but, I mean, my intention was just—I just spooked out."

When asked what he meant by getting "paranoid," he testified, "Just by the vehicle, just, approaching me and then I see somebody stick their hand out, you know. Just, I got paranoid, you know. Might be somebody, another guy, one of their friends or something trying to attack me or hurt me. That's my reaction the whole time when the vehicle approached me. I felt my life was in danger."

In closing, Hernandez argued along the same lines that he "got paranoid," and throwing the battery was his "natural reaction" after "being assaulted by three guys." He argued that during the entire rampage he was "in that mental state where everything was a threat to him."

Assuming Hernandez's testimony that he was "paranoid" showed he actually feared imminent danger and believed in the need to defend himself, the evidence was insufficient to show his belief was objectively reasonable. By his own account, Hernandez was the primary aggressor at the apartment complex. Five to eight minutes had elapsed since the fight in front of the liquor store. Angry, he walked 0.2 miles back to the apartment

41

complex. Although he denied assaulting Vizcarra, he made the "conscious decision" to return to the apartment complex and confront O'Campo, who had nothing to do with incident. He made another "conscious decision" to vandalize the truck with a piece of wood. He claimed Vizcarra punched him and O'Campo threw tools at him, which he then stole. He moved back out into the street. Only at that point did he see Garcia's SUV "approaching" and "following" him. He became so "paranoid" that he threw the battery at Garcia's SUV because he saw "somebody put their hand out or put something up in the air."

He didn't testify that the SUV came at him aggressively or in a way that might have suggested he was in harm's way. He didn't testify he thought the object he saw in Garcia's SUV was some kind of weapon, such as a gun. He didn't know what it was. We know from other testimony it was a cell phone. No one had brandished a weapon at any point during the incident, including any weapon that might have resembled a cell phone (such as a gun or knife), so there was no reason to assume someone in the SUV might also have a weapon. No reasonable person in this situation would have believed throwing a battery at Garcia's SUV was necessary to defend against imminent harm. No self-defense instruction was required.

## VI. Cumulative Prejudice

We have found no prejudicial error, so we reject Hernandez's argument that cumulative prejudice warrants reversal of the judgment.

## DISPOSITION

The judgment is affirmed.

                                                            BIGELOW, P. J.

We Concur:

            GRIMES, J.

            STRATTON, J.